**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **Alvaro Albanil, et al.,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **NO.  4:08-CV-00486 AND 4:08-** |
| | § | **CV-00487** |
| **Coast 2 Coast, Inc. and Jeffrey Wayne** | § | |
| **Taylor,** | § | |
| *Defendants.* | § | |
| | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY**
**JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE UNDER THE FLSA'S**
**MOTOR CARRIER ACT EXEMPTION**

Defendants Coast 2 Coast Inc. ("C2C"), and Jeffrey Wayne Taylor ("Defendants") hereby submit their response to Plaintiffs' Motion for Partial Summary Judgment on Defendants' Affirmative Defense under the FLSA's Motor Carrier Act exemption, and respectfully show the Court as follows:

### I.    NATURE AND STAGE OF THE PROCEEDINGS

This case is a collective action in which Plaintiffs ("Plaintiffs" or "Foremen" or "Chippers")[1] allege claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 206-207, and 215(a)(2), (3).   Defendants contend that Plaintiffs are exempt from FLSA overtime obligations via the motor carrier exemption pursuant to § 213(b)(1)[2] of the FLSA.  Specifically, C2C is a motor carrier using vehicles, or rigs, to transport property in interstate commerce in order to perform concrete chipping services for its customers all over the country.  All Plaintiffs are regularly engaged in activities that directly affect the operational safety of motor vehicles (i.e., the C2C rigs <u>and</u> the ready mix trucks in which Plaintiffs work).  The foremen Plaintiffs are

---

[1] As mentioned in Defendants' Motion for Partial Summary Judgment regarding the Motor Carrier Act exemption, [Doc. 51], upon which this Response primarily relies, this case (originally, the "chipper" lawsuit) was consolidated with the "foremen" lawsuit entitled *Abel Ramirez et al. v. Coast 2 Coast, Inc.*, 4:08-cv-00487 on April 1, 2009.  To the extent that this Response references "Plaintiffs," this refers to all forty-one plaintiffs and opt-in plaintiffs between the two lawsuits.  Where necessary, this Response distinguishes between foremen and chippers.

[2] § 213(b)(1) provides that § 207 (concerning maximum hours and overtime compensation) is not applicable to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49, commonly known as the Motor Carrier Act of 1935.  29 U.S.C. § 213(b)(1) (2006).

primarily responsible for driving C2C's rigs from Texas to job sites across the country, while the chipper Plaintiffs perform loading and vehicle maintenance/repair functions on C2C's rigs and in the cement trucks in which they work, and are otherwise readily available to be called upon to drive the rigs.  Accordingly, both the foremen and the chipper Plaintiffs perform duties described as being within the motor carrier exemption.  Finally, a Department of Labor (DOL) investigation into C2C's wage and hour practices conducted during 2007 and 2008 concluded that the motor carrier exemption was indeed applicable to the chippers and foremen working for C2C.  *See* Doc. 51, at Exhibit 1.  Specifically, the DOL noted that the motor carrier exemption was applicable to "all loaders and drivers of the firm."  *Id*. at C2C 0364.  This finding encompasses each and every plaintiff in this lawsuit.  The DOL also concluded that C2C's rigs were in excess of 10,001 pounds.  *Id*.  Finally, the DOL concluded that the drivers were exempt because they drove on a weekly basis, and that the chippers qualified as loaders because they "help[ed] to load supplies," and "hook[ed] the trailers onto the truck."  *Id*.  Therefore, Defendants respectfully request that the Court deny Plaintiffs' Partial Motion for Summary Judgment on Defendants' affirmative defense under the FLSA's Motor Carrier Act, and grant Defendants' Partial Motion for Summary Judgment [Doc. 51] on this issue as to all plaintiffs.

## II.   ARGUMENTS AND AUTHORITIES

**A.    Plaintiffs are exempt from overtime because C2C's rigs are "commercial motor vehicles," C2C transports passengers and property in interstate commerce, Plaintiffs routinely perform tasks that affect the safe operation of motor vehicles, and the DOL confirmed all of these findings in its recent post-SAFETEA-LU investigation.[3]**

**1.    C2C's vehicles are in excess of 10,001 pounds and meet the definition of "commercial vehicle."[4]**

A "commercial motor vehicle" is a motorized or towed vehicle used on the highways in

---

[3] Plaintiffs do not refute the fact that C2C transports passengers and property in interstate commerce, but for a more detailed discussion of C2C's satisfaction of this requirement under the motor carrier exemption, *see* Doc. 51, at *Ex. 2*, at ¶ 5; *Ex. 3*, at 21:17-21; 24:15-18; 40:6-7; *Ex. 4*, at 17:9-16; *Ex. 5*, at 12:13-24; *Ex. 6*, at 13:25;14:1-2; *Ex. 7*, at 13:4-10; *Ex. 8*, at 16:2-7; 18:1.

[4] On August 10, 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU" or "SAFETEA") was enacted and the term "commercial motor vehicle" was used to differentiate between non-commercial and commercial vehicles (over 10,001 pounds).  Prior to SAFETEA-LU, employees who moved non-hazardous goods in interstate commerce via light trucks and vehicles weighing less than 10,001 pounds were eligible for the motor carrier exemption of the FLSA, but because of SAFETEA-LU, the motor carrier exemption now applies only to employees who work in interstate commerce with *commercial motor vehicles*.  *See* 49 U.S.C. § 13102.

interstate commerce to transport passengers or property, if the vehicle –

    (A)    has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;

    (B)    is designed or used to transport more than 8 passengers (including the driver) for compensation;

    (C)    is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

    (D)    is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under the regulations prescribed by the Secretary under section 5103.

49 U.S.C. § 31132.  C2C uses "rigs," in its concrete chipping business, and such "rigs" consist of a Ford F250 or Ford F350 pick-up truck with a modified suspension and springs, walk-in work cap, upright steel shelving, and an attached trailer and trailer-mounted air compressor.  Doc. 51, at *Ex. 2*, at ¶ 11; *Ex. 9* at 66:23-25; 67:1-2; 76:24-25; 77:1-9.  The weight of the trucks ranges from 8,800 pounds to 9,900 pounds, the compressors weigh approximately 2,700 pounds each, and the weight of each trailer is at least 1,500 pounds.  *Id*. at *Ex. 2,* at ¶ 12; *Ex. 11*.  Thus, the total weight of the "rig" is approximately 12,500 to 14,000 pounds.  *Id*. at *Ex. 2*, at ¶ 12.  Moreover, when one of the trucks is attached to one of the trailers, the rear axle of the truck bears a significant portion of the weight of the trailer and the trailer-mounted compressor, thereby increasing the weight of the truck.  *Ex. 1, Affidavit of Jeff Taylor*, at ¶ 4.  The trucks are used only for commercial purposes, in order to further the business of Coast 2 Coast.  *Id*.

      For example, Attachment 1 to Exhibit 1 is a certified weight ticket belonging to C2C truck #2715, a Ford F350.  *Id*. at ¶ 5.  At the time that truck #2715 was weighed, it was connected to a C2C trailer, upon which was mounted trailer 08-1, C2C's lightest compressor.  *Id*.  Three chippers and one foreman were inside the truck, along with their personal luggage, and the equipment needed for their chipping job at the time that the truck was weighed.  *Id*.  The steer axle number (4220 pounds) represents the weight of the front axle of the truck, the rear axle number (7380 pounds) represents the rear axle of the truck, and the trailer axle number (1020 pounds) represents the partial weight of the trailer not otherwise supported by the rear axle of the truck.  *Id*. at ¶ 6.  As the weight ticket shows, the actual weight of truck #2715 without trailer is 11,600 pounds, which is well over 10,001 pounds.  *Id*.[5]  In further support of this proposition,

---

[5] For additional information concerning the truck weights of C2C's trucks, see ¶¶ 7-10 of Exhibit 1.

and in its determination of the applicability of the motor carrier exemption, the DOL made the express finding that C2C's rigs were well in excess of the 10,001-pound requirement.  Doc. 51, at Ex. 1.

>    **2.      C2C is alternatively able to prove that it meets the "commercial motor vehicle" definition by combining the weights of its trucks and trailers, and this is supported by the DOT, DOL, and the courts.**

SAFETEA-LU re-worded the pre-August 10, 2005 definition of "motor vehicle" to include the concept of combining vehicle weights within the term "gross vehicle weight" contained within the definition of "commercial motor vehicles."  *See* Pub. L. No. 109-59, sec. 4142, 119 Stat. 1144, at 1747 (Aug. 10, 2005).[6]  The definition of "gross" is important as it allows employers (who use their vehicles solely for commercial purposes) such as C2C to combine the weight of truck and trailer in order to obtain the <u>gross weight</u> of the unit in making their 10,001-pound determination.  The FMCSA[7] supports this interpretation, and states that if a vehicle with a manufacturer's gross vehicle weight rating (GVWR) of less than 10,001 pounds <u>has been structurally modified</u> to carry a heavier load, an enforcement officer can use the higher <u>actual</u> gross weight of the vehicle, instead of the GVWR, to determine the applicability of the Federal Motor Carrier Safety Regulations.  *See FMCSA Website*, 49 C.F.R. § 390.5 (Guidance) (September 1, 2005)(emphasis added).[8]  This is because structural modifications illustrate a motor carrier's intent to increase the weight rating of the vehicle.  *Id*.  Thus, when a vehicle is structurally modified to perform functions normally performed by a vehicle with a higher GVWR, § 390.33 <u>requires</u> an enforcement officer to treat the <u>actual gross weight</u> as the GVWR of the modified vehicle.  49 C.F.R. § 390.33 (2005) (noting that "whenever a commercial motor

---

[6]  Black's Law Dictionary defines "gross" as whole, entire, total, or not adjusted or reduced by deductions or subtractions.  *Black's Law Dictionary*, 485 (6th ed. 1983).  Likewise, Burton's Legal Thesaurus defines "gross" as aggregate, all-inclusive, complete, entire, undivided, whole, or without deductions.  William C. Burton, LEGAL THESAURUS 243 (1980).  Finally, Merriam Webster's Online Dictionary defines "gross" as "consisting of an overall total exclusive of deductions."  *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/gross (last visited August 24, 2009).

[7]  The Federal Motor Carrier Safety Administration is an administration within the DOT, and shares the exact same definition of "commercial motor vehicle" as Section 31132 -- a "self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle— **(A)** has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater . . ."  The FMCSA website is available at http://www.fmcsa.dot.gov (last visited August 24, 2009).  As this Response argues that Plaintiffs are subject to the jurisdiction of the Secretary of the DOT, it makes sense that analysis by a branch of the DOT concerning a definition shared with the DOT is applicable and relevant to solving a question of statutory interpretation.

[8]  The FMCSA website shows the guidance and regulations to be effective as of September 1, 2005, which occurred after the enactment of SAFETEA-LU on August 10, 2005.

vehicle of one type is used to perform the functions normally performed by a commercial motor vehicle of another type, the requirements of this subchapter . . . shall apply to the commercial motor vehicle and to its operation in the same manner as though the commercial motor vehicle were actually a commercial motor vehicle of the latter type")(emphasis added).

In the instant case, C2C structurally modified its pick-up trucks by altering the suspension and springs to absorb the weight of the towed trailer/compressor, installing an upfit walk-in cap, heavy-duty steel shelving, and attaching a double axle-trailer with a mounted compressor, and thus, C2C's intent to increase the weight rating of its trucks is apparent.  Doc. 51, at *Ex. 9,* at 66:23-25; 67:1-2; 76:24-25; 77:1-9.  Therefore, an enforcement officer would be compelled to recognize the <u>actual gross weight</u> of one of Defendants' rigs (12,500 to 14,000 pounds) rather than the GVWR (8,800 to 9,900 pounds) assigned by the manufacturer to an individual truck.  In further support of the DOT's interpretation, courts have recognized that <u>gross vehicle rating is a separate concept from the overall weight</u> of a vehicle.  *Exhibit 2, Hernandez v. Brink's Inc.*, No. 08-20717-CIV, 2009 WL 113406, **4-5 (S.D. Fla. Jan. 15, 2009) (noting that after SAFETEA-LU, the Secretary of Transportation had jurisdiction over a person transporting property if the vehicle had "the greater of a gross vehicle rating *or weight* of at least 10,001 pounds") (emphasis added).  This case supports Defendants' contention that the weight of C2C's rig, at over 10,001 pounds, and in its entirety, meets the definition of a commercial motor vehicle, and therefore, enables the Secretary of Transportation to exercise jurisdiction over Plaintiffs.  C2C would be unable to perform its concrete removal operations without its rigs, and considering only the weight of a pick-up truck (as Plaintiffs request of this Court) makes no sense, as it is the rig in its entirety that travels on interstate highways, and not just an individual truck or trailer belonging to C2C.  The Court cannot lose sight of the fact that the 10,001-pound definitional requirement of the term "commercial vehicle" was intended to distinguish between employers using passenger vehicles (i.e. personal cars and lightweight pick-up trucks) versus employers using heavy-duty trucks and rigs for their commercial purposes, such as C2C. Accordingly, when the weight of any of the C2C trucks and trailers are combined, the rigs are in excess of 10,001 pounds, and easily meet the definition of "commercial motor vehicle."

Finally, a Department of Labor (DOL) investigation of C2C's wage and hour practices conducted during 2007 and 2008 concluded that the motor carrier exemption was indeed applicable to the chippers and foremen working for C2C.  *See* Doc. 51, at Exhibit 1.  The DOL

specifically concluded that C2C's rigs were in excess of 10,001 pounds because "the firm has its employees drive Ford F350 and F250 where the GVWR are 9900 lbs and 8800 lbs respectively. . . the compressor trailer [has a] GVWR of 2700 lbs," [and] therefore, the combined GVWR exceeds 10,001 lbs." *Id.* As a result, the vehicles used by C2C are in excess of 10,001 pounds as is required by the definition of "commercial vehicle" contained in Section 31132 (post-SAFETEA-LU), and the Secretary of Transportation is rightfully able to exercise her jurisdiction over Plaintiffs in establishing qualifications and maximum hours of service pursuant to the Motor Carrier Act of 1935.

> **3.     Alternatively, if the MCA exemption is not applicable, C2C is permitted to take advantage of the one-year safe harbor provided by the Technical Corrections Act because C2C did not have any actual knowledge that it was subject to the requirements of SAFETEA-LU.**

Effective June 6, 2008, Congress clarified that an employer shall not be liable under the FLSA if a violation of SAFETEA-LU occurred in the one-year period beginning August 10, 2005, if the employer did not have actual knowledge that the employer was subject to its requirements with respect to the covered employee. SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, § 306, 122. Stat. 1572, 1620 (2008). Thus, this Court should also find that in the event Defendants have any liability to Plaintiffs, such liability could not exist for the period from August 10, 2005 to August 10, 2006 because Defendants did not have actual knowledge that they were subject to the requirements of SAFETEA-LU. *Exhibit 3*, *Deposition of Jeffrey Taylor on March 20, 2009*, at 222:7-15; 223:1-11 (stating that he did not know the requirements of SAFETEA-LU).[9]

---

[9] A ruling on the applicability of the TCA's safe harbor provision would narrow the outstanding damages issues and assist the parties in their efforts to settle the claims that survive the respective motions for partial summary judgment.

**B.**   **The chipper Plaintiffs exercised discretion and directly affected the safety of operation of motor vehicles as contemplated by 29 C.F.R. §782.2(a)**.[1011]

    **1.**   **Plaintiffs directly affected the safety of operation of motor vehicles with their loading responsibilities.**

Despite Plaintiffs' contention that the chippers merely served as the physical labor to place items in the trucks, testimony of the Plaintiffs proves that this is not the case. Specifically, the chippers know precisely how to securely load supplies and equipment into the truck in a safe manner, and the foreman merely double checks the chippers' loading to make sure that the load is safe. Doc. 51, *at Ex. 3,* 32:24-25; 33:1; *Ex. 8*, at 28:6-9. The testimony of two chippers in particular is a perfect illustration of the discretion exercised by C2C chippers in loading the heavy-duty equipment transported on each chipping trip. *Id*. at *Ex. 5,* at 20:20-25; 21:2-25 (noting that he would place items "such as they would be safe," and balanced, and would place the items "as I would think they were correctly done."); *Ex. 6,* at 20:22-25; 21:12-14 (noting that he would load equipment in to the C2C rig on every single trip, and would place items in the truck so that they would not "spread out," and so that they could be easily located). Based on this evidence, each chipper on a given crew has his own method of safely loading the tools on the truck, so that the crew does not encounter any load-shifting problems while driving on the road to a jobsite. *Id*. at *Ex. 13*, at 44:13-19; 48:15-25; 49:1-7; 76:14-20; 77:13-20. Despite the fact that the foreman ultimately reviews the chippers' loading job once they are complete (in Pasadena at the beginning of each job, and at each jobsite at the completion of a job), the chippers exercise discretion in loading all of the equipment and determining the safest location for all pieces brought on each trip. *Id*. at 84:1-5; 84:16-22. Finally, five of the chippers signed affidavits specifically stating that they perform tasks <u>directly affecting the safety of C2C's vehicles traveling in interstate commerce</u>. *Id*. at *Ex. 16*. Specifically, these five chippers stated that they loaded and unloaded equipment, work supplies, and other work items on and off C2C's

---

[10] In their Motion for Partial Summary Judgment, Plaintiffs concede that the foremen Plaintiffs drove C2C's rigs, and therefore, performed activities directly affecting the safety of operation of motor vehicles in interstate commerce. [Doc. 52, at 23]. Accordingly, this section of the Response focuses on the activities of the chipper Plaintiffs.

[11]   29 C.F.R. § 782.2(a) provides that the power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who: (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to her jurisdiction under section 204 of the MCA; and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA.

vehicles and trailers. *Id*. Accordingly, the chippers in this case fall within the motor carrier exemption for loaders. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 905-06 (6th Cir. 2002) (finding loaders exempt under the motor carrier exemption despite the fact that loaders frequently operated under the direct control of a supervisor); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1197 (4th Cir. 1969) (applying motor carrier exemption to loaders where workers in question were told by supervisors exactly which trucks to load and had their work checked, but exercised independent discretion during the loading process).

>    **2.    Plaintiffs directly affected the safety of operation of motor vehicles with their vehicle maintenance responsibilities.**

In addition to their loading duties, the chippers were also responsible for assisting in maintaining the rigs, thus directly affecting the safety of operation of C2C's vehicles. Chippers regularly checked tire pressures of the trucks and trailers, properly hitched and unhitched C2C trailers and lights to and from C2C vehicles, performed routine safety checks of C2C vehicles, trailers, and their component parts, and performed repairs to C2C vehicles and trailers while traveling in interstate commerce. Doc. 51, at *Ex. 6,* at 23:16-22; *Ex. 7,* at 27:11-23; *Ex. 8,* at 19:25; 20:1; 34:19-25; 35:1-7; 36:18-20; 37:14-18; 42:3-6; 42:23-25; 43:1; *Ex. 12,* at 23:14-21; *Ex. 16*. Indeed, chippers regularly changed truck tires, changed oil, replaced vehicle fluids, replaced truck alternators, and replaced headlights or batteries before and during each trip. *Id*. at *Ex. 5,* at 26:18-24; *Ex. 8*, 39:1-11; 40:22-25; 41:1-2; 43:18-22; *Ex. 12*, at 89:23-25; 90:1-2; *Ex. 13*, at 23:14-21; 24:7-14; 29:21-25; 30:1-14; *Harshman v. Well Serv. Inc.*, 248 F. Supp. 953, 956-57 (W.D. Pa. 1964) (applying motor carrier exemption to employees who loaded, operated, and performed routine maintenance such as repair and replacement of lights, replacement of windshield wiper blades, oiling and greasing, and tire and wheel replacement on employer's cement pumping trucks).

### 3. Plaintiffs directly affected the safety of operation of motor vehicles every time they chipped out a cement truck.[12]

The cement trucks in which the crews work typically weigh between 20,000 to 25,000 pounds. *Ex. 1*, at ¶ 11. The average truck can haul ten yards of wet concrete, and at 4,000 pounds per yard, the average concrete truck holds around 35,000 to 45,000 pounds of wet concrete. *Id.* The total weight of the cement trucks in which the chippers work is around 55,000 to 70,000 pounds. *Id.* The cement trucks in which the chippers work travel in interstate commerce. *Id.* Before beginning each job, chippers remove the key from the ignition of the concrete truck, disconnect the concrete truck's battery, insert wheel chocks to immobilize the concrete truck's wheels and drum, and secure the doors of the concrete truck with heavy chains. Doc. 51, at *Ex. 6*, at 13:3-7; 18:18-22; *Ex. 7*, at 17:15-22; *Ex. 8*, at 24:3-4; *Ex. 12*, at 46:22-25; 47:1-22; 49:10-13; *Ex. 13*, at 46:10-25; 47:1-22; 48:9-14; 49:1-13; *Ex. 14*.

Otherwise, chippers directly affect the safety of operation of the cement trucks because without chipping, the trucks would not be able to transport on the public highways, passengers, or property in interstate or foreign commerce. *Ex. 1*, at ¶ 4. In fact, when unchipped, the concrete trucks are typically thousands of pounds in excess of road weight limits set by the DOT. Doc. 51 at *Ex. 14*, at ¶ 9. This creates a much higher chance of crashing due to an overloaded brake system and suspension. *Id.* The chippers also significantly affect the safety of the cement truck's operations by providing "slosh room" in the drum. *Id.* at ¶ 10. Specifically, when the drum is full, the concrete truck will splash concrete on to the road or on other vehicles, and this is a serious safety hazard. *Id.* As a result, chipping the concrete out of the drum allows for "slosh room" so that this does not occur. *Id.* Because the chippers affect the safety of operations of every concrete mixer truck in which they work, the chippers are also subject to the motor carrier exemption for this reason.

---

[12]  29 C.F.R. § 782.2(a) in describing the requirements to meet the motor carrier exemption, only states that the individuals in question must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." There is no requirement that the individuals perform these activities in or on vehicles owned by the employer, and accordingly, Defendants' evidence in this section will show that the Plaintiffs' work chipping the concrete trucks directly affected the safe operation of the concrete trucks in which they worked, and is but another basis to show that Plaintiffs were properly included within the motor carrier exemption.

**4.     Finally, Plaintiffs fall within the motor carrier exemption because at all times they could have been called upon to drive in interstate commerce.**

Even employees who are only "subject to," or have an otherwise minor involvement in interstate commerce are covered by the MCA exemption.  *Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131 (1947); *Barefoot v. Mid-Am. Dairymen, Inc.*, 826 F. Supp. 1046, 1049 (N.D. Tex. 1993) *aff'd*, 16 F.3d 1216 (5th Cir. 1994); *Badgett v. Rent-Way, Inc.*, 350 F. Supp. 642, 655 (S.D. Tex. 2004) (citing 46 FR 37902-02, 1981 WL 115508, *37902 (July 23, 1981) for the proposition that "[E]ven a minor involvement in interstate commerce as a regular part of an employee's duties will subject that employee to the jurisdiction of the [Federal Highway Administration")).  In *Morris*, the Supreme Court held that drivers who drove vehicles about 4% of the time were exempt, and that an employee need not spend most or even all of his time driving.  *Morris*, 332 U.S. at 422.  In *Levinson*, the Supreme Court determined that "the fundamental test is simply that the employee's activities affect safety of operation," and in fact:

> . . . it is not a question of fundamental concern whether or not it is the larger or the smaller fraction of the employee's time or activities that is devoted to safety work.  It is the character of the activities rather than the proportion of either the employee's time or activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment.

*Levinson v. Spector Motor Serv.*, 330 U.S. 649, 671, 674-75 (1947) (emphasis added); *Friedrich v. U.S. Computer Servs.*, 974 F.2d 409, 418 (3d Cir. 1992) (affirming the district court's application of the motor carrier exemption to plaintiffs and noting that it was not "significant" that the plaintiffs did not drive the defendant's vehicles); *Sinclair v. Beacon Gasoline Co.*, 447 F. Supp. 5, 9 (W.D. La. 1976), *aff'd*, 571 F.2d 978 (5th Cir. 1976)(opining that "the test is not whether a substantial part of the employee's duties affect the safety of interstate operation of motor vehicles . . . The test then is whether a particular employee's duties have a substantial effect on the safety of operation in interstate commerce.").

Indeed, the DOT and the DOL have both adopted the "could be called upon" standard as part of their regulations.  Under applicable DOT regulations, if employees make an interstate trip, or otherwise engage in exempt interstate activities, ***or could be called upon to make an interstate trip or otherwise engage in exempt activities***, they would be considered subject to

DOT regulation and would be exempt for four (4) months from the time they were so engaged *or could be called upon to become so engaged.* 46 Fed. Reg. 37,902, 37,903 (1981) (emphasis added). The DOL's regulation similarly provides: "If the bona fide job duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers . . . that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . . , he comes within the exemption in all workweeks when he is employed in such job . . . ." 29 C.F.R. § 782.2(b)(3).

In the present case, Plaintiffs continuously worked as chippers, traveling primarily outside of Texas and in the stream of interstate commerce. Plaintiffs' duties as chippers require them to load supplies and equipment into C2C vehicles (in preparation for, and at the conclusion of work each day while on the road), assist the foreman in driving, as needed, inspect the rig for safety concerns at the inception of, and during, each trip, perform vehicle repair and maintenance duties as needed, and ultimately, perform chipping duties at each worksite. Doc. 51, at *Ex. 2,* at ¶¶ 9, 10. At any time during their employment, Plaintiffs could have been called upon to assist in driving the C2C rig across state lines, and indeed – the testimony of one chipper proves that chippers could at any time be called upon to perform driving duties, especially when foremen become too tired to drive. *Id.* at Ex. *8,* at 20:12-15; 22:1-4; 22:8-11. In sum, the chipper Plaintiffs belong to the class of employees over whom the Secretary of Transportation should – and does – have jurisdiction because they could have been called upon to engage in interstate transportation and, indeed, actually engaged in interstate transportation during their employment with C2C. *Harshman*, 248 F. Supp. at 956-57 (applying motor carrier exemption and finding that employees reasonably expected to be called upon at any time to perform the duties of driver, driver's helper, loader, and mechanic with respect to employer's pump trucks). For this additional reason, the chippers qualify for the motor carrier exemption and are exempt from overtime.

For these reasons, Defendants respectfully request the Court to deny Plaintiffs' Partial Motion for Summary Judgment on Defendants' Affirmative Defense under the FLSA's Motor Carrier Act Exemption, and grant Defendants' Partial Motion for Summary Judgment.

Respectfully submitted,

/s/ G. Mark Jodon
_____

Of Counsel:

Alison J. Gates
State Bar No. 24055535
Federal I.D. No. 706309
LITTLER MENDELSON
A PROFESSIONAL CORPORATION
1301 McKinney Street
Suite 1900
Houston, TX  77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)

G. Mark Jodon (Attorney-in-Charge)
State Bar No. 10669400
Federal I.D. No. 6052
1301 McKinney Street
Suite 1900
Houston, TX  77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
ATTORNEYS FOR DEFENDANTS
COAST 2 COAST, INC. AND JEFFREY WAYNE
TAYLOR

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system that will send notification of such filing to the following:

Galvin B. Kennedy
KENNEDY HODGES, L.L.P.
3701 Kirby Drive, Suite 400
Houston, Texas  77098

Barry S. Hersh
HERSH LAW FIRM, P.C.
3626 N. Hall Street, Suite 800
Dallas, Texas  75219-5133

/s/ G. Mark Jodon
_____
G. Mark Jodon

Firmwide:91674358.2 059045.1002