# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ALVARO ALBANIL *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION H-08-486 |
| COAST 2 COAST, INC. AND | § | |
| JEFFREY WAYNE TAYLOR | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendants' motion for partial summary judgment on the motor carrier exemption (Dkt. 51) and plaintiffs' cross motion on the same issue (Dkt. 52); plaintiffs' motion for summary judgment on the issue of liability (Dkt 53); and plaintiffs' motions to strike portions of defendants' summary judgment responses and exhibits (Dkts. 62, 67).  After review of the motions, responses, replies, and the applicable law, defendants' motion for partial summary judgment (Dkt. 51) is GRANTED and plaintiffs' motions for partial summary judgment (Dkts. 52, 53) are DENIED.  Additionally, plaintiffs' motions to strike (Dkts. 62, 67) are DENIED AS MOOT, except for the request to strike defendants' rate sheet which is DENIED.  Furthermore, for the reasons stated below, summary judgment is GRANTED in favor of defendants as to all of the plaintiffs' claims.

## BACKGROUND

Plaintiffs are forty-one current and former employees of defendant Coast 2 Coast, Inc. ("C2C"), headquartered in Petersburg, Kentucky.[1]  Defendant Jeffrey Wayne Taylor is the President

---

[1] The drivers and chippers originally filed two separate lawsuits that were later consolidated by court order.  *See* Dkt. 45.

of C2C.  C2C employs laborers to remove hardened concrete from mixer drums and other enclosed spaces at customer sites throughout the United States.  Plaintiffs are or were employed as either drivers or concrete removal laborers ("chippers") for C2C.  Drivers and chippers are organized into "crews" led by a foreperson—the driver—and assigned to specific jobsites.  The crews depart from Pasadena, Texas, and are usually gone for several weeks at a time, during which time they stay in motels paid for by C2C.  The crews travel in "rigs," which are composed of either a Ford F250 or F350 pickup, fitted with a "work cap" that allows for storage of the concrete removal tools, which tows a trailer fitted with a permanently mounted air compressor that powers the tools.

Plaintiffs bring this case under the Fair Labor Standards Act ("FLSA"), alleging violations for failure to pay minimum and overtime wages. 29 U.S.C. §§ 206–207, 213.  Specifically, plaintiffs allege that they have not been properly compensated for travel time and for other required activities.  As a result, defendants have failed to pay the plaintiffs the required minimum wage and also have failed to pay them overtime wages for hours worked beyond 40 hours each workweek.  Plaintiffs further allege that the defendants violated provisions of the Texas Labor Code and the FLSA by unlawfully deducting $28.00 per paycheck for workers' compensation insurance.

Defendants filed a motion for partial summary judgment, asserting that they are exempt from paying overtime wages by the motor carrier exemption.  Dkt. 51.  Plaintiffs' filed a cross motion for summary judgment on the same issue.  Dkt. 52.  Additionally, plaintiffs' filed a motion for partial summary judgment on the issue of liability as to the remaining claims: minimum wage violations and the improper deductions for workers' compensation insurance.  Dkt. 53.  Plaintiffs also filed two motions to strike certain portions of defendants' summary judgment responses and some of the summary judgment evidence submitted.  Dkts. 62, 67.

2

ANALYSIS

I.      **Motions to Strike**

Plaintiffs filed two motions to strike in connection with the motions for summary judgment. The first motion asks the court to strike some of the statements made by Taylor in his sworn affidavit, his declaration, and his deposition testimony; mileage reports submitted by C2C; certificates of registration from Kentucky for some of the rigs used by C2C; specification sheets and certificates of origin for some of the compressors used by C2C; the Department of Labor's ("DOL") FLSA Narrative produced as part of the DOL investigation; and affidavits signed by the plaintiffs, but not notarized, that were produced by defendants as part of a DOL investigation.  Dkt. 62.  As none of this contested evidence was relied upon by the court in ruling on the motions for summary judgment, this motion is DENIED AS MOOT.

The second motion to strike asks the court to strike all evidence related to defendants' assertions that they are covered by the motor carrier exemption by virtue of the chippers job duties, which entail chipping concrete out of trucks that travel in interstate commerce; weight tickets submitted as illustrative of the rigs weight and Taylor's affidavit on the same subject; and the rate sheet submitted by the defendants to demonstrate they paid the plaintiffs more than minimum wage. Dkt. 67.  The court need only address the latter item, the rate sheet, for purposes of these summary judgment motions.

Plaintiffs drop only a footnote in their motion to strike in regard to the rate sheet.  Dkt 67 at n.2.  Plaintiffs contend that the rate sheet is "too untimely, lacks foundation, and is inadmissible hearsay without an exception."  *Id.*  Defendants, however, aver that the rate sheet is simply a summation of C2C's business records kept in the ordinary course of business, the detailed business records were produced during discovery, and the rate sheet itself was produced by the agreed

3

extended discovery deadline. Because business records kept in the normal course of business are an exception to the hearsay rule and the rate sheet is merely a summary of these records, the court DENIES plaintiffs' motion to strike the rate sheet. The remaining items in the motion to strike are DENIED AS MOOT as the court did not rely upon them in ruling on the motions for summary judgment.

## II. Summary Judgment

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). Upon a defendant's motion for summary judgment, the plaintiff "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material

4

fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required.  *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

5

**A.  Motor Carrier Act ("MCA") Exemption to the FLSA's Overtime Provisions**

*1.  The Legal Standard*

The FLSA requires employers to pay their employees at a rate of one-and-a-half times their normal pay for hours worked in excess of forty hours per week.  *See* 29 U.S.C. § 207(a)(1).  There are, however, several exemptions to this overtime requirement.  In particular, the overtime requirement does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act ("MCA")]." 29 U.S.C. § 213(b)(1); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181 (11th Cir.1991); *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1048 (N.D. Tex. 1993).  "The Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the [MCA] are mutually exclusive and there are no overlapping areas of jurisdiction." *Spires v. Ben Hill County,* 980 F.2d 683, 686 (11th Cir. 1993) (citing *Morris. v. McComb*, 332 U.S. 422, 437, 68 S. Ct. 131 (1947)).  In order for the MCA exemption to apply, it is not necessary that the Secretary of Transportation *actually* exercise power; the Secretary needs only to possess the power to regulate the employees at issue." *Barefoot*, 826 F. Supp. at 1048 (emphasis added) (citing *Levinson v. Spector Motor Serv.,* 330 U.S. 649, 678, 67 S. Ct. 931 (1947)).

An exemption to the FLSA is to be narrowly construed against the employer and the employer bears the burden of proof to show that it qualifies for the exemption.  *Cleveland v. City of Elmendorf, Tex.*, 388 F.3d 522, 526 (5th Cir. 2004).  The application of the MCA exemption "depends both on the class to which [the] employer belongs and on the class of work involved in the employee's job."  29 C.F.R. § 782.2(a).  Specifically, this exemption applies to those class of employees: 1) employed by carriers whose transportation of passengers or property by motor vehicle

is subject to the Secretary of Transportation's jurisdiction under the MCA; and 2) who directly engage in activities that affect the safety operations of motor vehicles in interstate or foreign commerce within the meaning of the MCA. *Id.*; *Barefoot,* 826 F. Supp. at 1049.

### 2. *Discussion*

#### a. C2C's status under the MCA for the period August 10, 2005–June 6, 2008

The MCA has undergone several revisions over the past few years, which are relevant to this case. Prior to 2005, the MCA gave the Department of Transportation ("DOT") regulatory authority over most of the light trucks and vehicles in interstate commerce, regardless of the weight of the vehicles. As a result, many employees fell under the MCA exemption to the FLSA and employers were not required to pay them overtime wages. On August 10, 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") went into effect. Pub. L. No. 109-59, § 4142, 119 Stat. 1144, 1747. This amendment restricted the DOT's regulatory authority (and thereby narrowed the FLSA exemption) to only those motor carriers and motor private who operated "commercial motor vehicles (as defined in [49 U.S.C.] section 31132)." Section 31132 defines a commercial motor vehicle as:

> A motorized or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle -
>> (A) has a gross vehicle weight rating or a gross vehicle weight of at least 10,001 pounds, whichever is greater;
>> (B) is designed or used to transport more than 8 passengers (including the driver) for compensation;
>> (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
>> (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placards under the regulations prescribed by the Secretary under section 5103.

Many employees that formerly fell under the MCA exemption were suddenly required to be paid overtime by this amendment.  Recognizing this sudden change might catch employers off guard, Congress later included a one-year safe harbor provision for employers.  *See* SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, § 306, 122. Stat. 1572, 1620.  Additionally in 2008, Congress again amended the MCA exemption and changed the term "commercial motor vehicle" back to "motor vehicle," once again affording a larger class of employers exemption from the FLSA's overtime requirements.  *See id.*  Thus, only for the period between August 10, 2005 through June 6, 2008, did an employer have to operate a "commercial motor vehicle" in order to be exempt from the FLSA's overtime requirements.

Defendants claim that even under the narrower scope of the MCA exemption in place between 2005–2008, they still fell under the jurisdiction of the Secretary of Transportation as a motor private carrier.[2]  They argue that the combined, actual, gross weight of the rig—comprised of the pickup truck with the work cap, trailer, air compressor, cargo, and passengers—exceeds the 10,001 pound commercial motor vehicle weight requirement. Dkt. 51 at 9.  Plaintiffs, however, urge the court to strictly construe the definition of commercial motor vehicle and afford it its plain meaning.  They point specifically to the language in 49 U.S.C. § 31132 that states a commercial motor vehicle is "a motorized *or* towed" vehicle and not both.   Dkt. 52 at 16; Dkt. 61 at 3.  Furthermore, plaintiffs argue, Congress implicitly rejected a definition of commercial motor vehicle

---

[2]During the period in question, a motor private carrier was defined as:
a person, other than a motor carrier, transporting property by commercial motor vehicle (as defined in section 31132) when—
    (A) the transportation is [in interstate commerce];
    (B) the person is the owner, lessee, or bailee of the property being transported; and
    (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.
49 U.S.C. § 13102.  The parties dispute only that C2C was operating commercial motor vehicles.

that contemplated a combined gross weight by not adopting language used in DOT regulations that existed at the time of SAFETEA-LU's enactment. Dkt. 52 at 20.

This last argument is unsupported by the plain language of SAFETEA-LU. With SAFETEA-LU's passage, Congress merely substituted the term "commercial motor vehicle" for the term "motor vehicle" in the definitions of "motor carrier" and "private motor carrier" found in 49 U.S.C. § 13102. Pub. L. No. 109-59, § 4142, 119 Stat. 1144, 1747. Both "commercial motor vehicle" and "motor vehicle" were terms already defined in the existing DOT statutes and the definitions were not modified by SAFETEA-LU's passage. *See* 49 U.S.C. §§ 13102(16), 31132(a). It is no surprise, therefore, that the DOT already had regulations in place that detailed how the weight of a vehicle should be calculated in determining whether it met the definition of a commercial motor vehicle. *See* 49 C.F.R. § 390.5. Thus, quite to the contrary of what the plaintiffs argue, Congress appears to have intended the term commercial motor vehicle to be given its current (circa 2005) meaning under the existing DOT regulations, which contemplated a combined gross weight.

Additionally, plaintiffs seem to lose sight of the fact that the FLSA's MCA exemption specifically looks to the DOT's scope of authority in determining whether an employer is subject to the overtime requirements. Because the DOL's and the DOT's jurisdiction are mutually exclusive, if the DOT *could* exercise jurisdiction over C2C's rigs, then it would belong to the class of employers to which the MCA exemption applies. The court, therefore, need only look to the DOT statutes and regulations during the period in question to see if C2C's rigs could have been under the DOT's jurisdiction.

At the time of SAFETEA-LU's enactment in 2005 (and still in effect to the present day), the DOT regulations provide:

9

Commercial motor vehicle means *any self-propelled or towed motor vehicle* used on a highway in interstate commerce to transport passengers or property when the vehicle

> (1) *Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater*; or
> (2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or
> (3) Is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
> (4) Is used in transporting material found by the Secretary of Transportation to be hazardous under 49 U.S.C. 5103 and transported in a quantity requiring placarding under regulations prescribed by the Secretary under 49 CFR, subtitle B, chapter I, subchapter C.

Federal Motor Safety Carrier Regulations, 49 C.F.R. § 390.5. (emphasis added). The regulation uses the same language found in 49 U.S.C. § 31132, "any self-propelled or towed motor vehicle," but then further details what combinations can be considered in determining whether a vehicle is considered to be a commercial motor vehicle. Additionally, the regulation further defines:

> Gross combination weight rating (GCWR) means the value specified by the manufacturer as the loaded weight of a combination (articulated) motor vehicle. In the absence of a value specified by the manufacturer, GCWR will be determined by adding the GVWR of the power unit and the total weight of the towed unit and any load thereon.

> Gross vehicle weight rating (GVWR) means the value specified by the manufacturer as the loaded weight of a single motor vehicle.

*Id.* (emphasis added). Thus, under the plain language of the regulation, the rig would be considered a commercial motor vehicle if it exceeded the 10,001 pound weight requirement. Further, this combined weight requirement would be met if the sum of the GVWR of the pickup truck (the power unit) and the total weight of the trailer (towed unit) with the attached compressor (the load thereon) exceeded 10,001 pounds. Alternatively, if the actual weight of the rig (the gross combination weight, which includes passengers and cargo) exceeded 10,001 pounds, the rig would also qualify.

10

b. Weight of C2C Rigs

In their motion for summary judgment, defendants point to a variety of evidence[3] to show that the rigs meet the weight requirement as a matter of law. Plaintiffs, however, contend that the defendants have no evidence of the weight of each specific rig combination (truck, trailer, and compressor) used by each individual plaintiff for each trip during the period between 2005–2008. Without such evidence, plaintiffs argue, the defendants have not met their burden, and therefore, as a matter of law do not fall under the Secretary of Transportation's jurisdiction for the period in question—this would also place the defendants outside the MCA exemption to the FLSA's overtime requirements. While it is true that the defendants cannot produce the exact configuration of each rig used by each plaintiff on each trip, the deposition testimony makes clear that there were only so many pickup trucks, trailers, and compressors owned by C2C during the time period, and thus the combinations possible are limited. The court, therefore, finds the plaintiffs' arguments on this point unavailing. While the defendants do bear the burden to show they are exempt from the FLSA's overtime provisions, this burden cannot be insurmountable.

After reviewing the summary judgment evidence before the court, C2C's rigs meet the test of a commercial motor vehicle as a matter of law under at least two of the methods detailed in the DOT regulations. First, as mentioned above, one method the DOT regulations set forth for calculating the GCWR is to sum the GVWR of the power unit (the pickup truck) with the actual weight of the trailer and load thereon. The parties acknowledge that the GVWR of the Ford F250 and F350 pickups used by C2C have GVWRs of 8800 and 9900 pounds respectively. *See* Dkt. 61, Ex. 3 at 64–65. Additionally, the parties agree, or at least plaintiffs do not refute, that the weight of

---

[3]Some of this evidence was the subject of the plaintiffs' motions to strike, which was discussed previously.

the compressor is at least 2,000 pounds. *See* Dkt. 61, Ex. 3 at 71. Thus, at a minimum, the sum of the GVWR of the pickup and the actual weight of compressor is more than 10,001, without even considering the actual weight of the trailer. The rig, therefore, meets the requirements of a commercial motor vehicle.

Second, and in the alternative, the court concludes that no reasonable jury could find that the actual weight of the rig loaded with its cargo and passengers (the gross combination weight) is less than 10,0001 pounds. Plaintiffs contend the curb weight (actual weight) of the pickups is as low as 5760 pounds. *See* Dkt. 52 at 24. Even so, to calculate the actual weight of the rig requires summing the actual weight of the pickup (approximately 5760 pounds), plus the weight of the compressor (2000 pounds), plus the weight of a double-axle trailer that can haul such a compressor across the country, plus the weight of the driver and four chippers that make up the crew as well as each person's luggage for a multi-week trip, and the weight of the following list of tools: six jackhammers, six steel braid jackhammer whip hoses, six 50" 3/4" air hoses, seventy-five jackhammer chisels, twenty-five jackhammer points, fifty jackhammer upper sleeves, fifty jackhammer lower sleeves, fifty jackhammer rubbers, 100 jackhammer springs, one OSHA tripod and winch with harnesses and safety ropes, one fresh air system with four 50" steel braid air supply lines, hoods and masks for the crew, four full face respirators, four half-face respirators, ten sets of safety glasses, five hard hats, 100 p-100 air filters, eight wheel chocks, eight drum chocks, five electric lockout boxes and locks, five "Do Not Operate" signs, door lockout chains and locks, one ½" impact gun and accompanying tool sets, one rock drill, one larger splitter jackhammer, personal protective equipment for the entire crew, eight drum lighting sets and cords, fifty replacement drum lighting bulbs, and three dozen sets of gloves. Dkt. 51, Ex. 2., ¶ 13. It strains logic to imagine that the combined weight of all the above could be less than 10,001 pounds when the actual weight of

the pickup and compressor alone weighs 7760 pounds and a crew of five adult men must, arguably, weight at least 500 pounds. This leaves a mere 1741 pounds for the weight of the double-axle trailer that can haul the 2000 pound compressor around the country and all the above equipment.  Thus, for this alterative reason, the rig meets the weight requirements of a commercial motor vehicle as a matter of law.

Although, the court must view the evidence in the light most favorable to the plaintiffs when evaluating the defendants' motion for summary judgment on this issue, the plaintiffs cannot defeat summary judgment with "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  This is exactly what the plaintiffs attempt to do, offering nothing of substance to refute the weight of the rig components and thereby create a genuine issue of material fact.  Therefore, under at least either of two methods specifically articulated by the DOT in calculating the weight of a vehicle in determining whether it is a commercial motor vehicle, the rigs meet the weight requirement.

### c. Driver and Chipper Activities

Even if an employer is subject to the Secretary of Transportation's jurisdiction under the MCA, only those employees who directly engage in activities that affect the safety operations of motor vehicles in interstate or foreign commerce within the meaning of the MCA, are exempt from overtime pay.  Drivers, as a matter of law, almost always fall within this definition.  *See* 29 C.F.R. § 782.3; *Levinson*, 330 U.S. at 666–68; *Barefoot*, 826 F. Supp. at 1050.  In the present case, driving rigs around the United States to the various jobsites was the main job of the drivers, and thus the driver plaintiffs clearly meet this prong of the test.

As for the chipper plaintiffs, both the plaintiffs and defendants center their arguments around whether the chippers qualify as exempt "loaders."  *See* 29 C.F.R. § 782.5(a).  The regulations,

however, contemplate another class of workers that more closely fits the chippers' job descriptions. The regulations define a "driver's 'helper'"(or driver-helpers) as "an employee other than a driver, who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act. 29 C.F.R. § 782.4(a). "[A]n employee may be a 'helper' under the official definition even though such safety-affecting activities constitute but a minor part of his job." 29 C.F.R. § 782.4(b). Such helpers are exempt from overtime pay. 29 C.F.R. § 782.4(c). However, to be exempt, the drivers-helper "must be 'required' as part of his job to ride on a motor vehicle when it is being operated in interstate or foreign commerce; an employee of a motor carrier is not exempted as a "helper" when he rides on such a vehicle, not as a matter of fixed duty, but merely as a convenient means of getting himself to, from, or between places where he performs his assigned work." *Id.; see also Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962) (empty soda bottle route helpers held to be driver-helpers); *Hernandez v. Brinks, Inc.*, 2009 WL 113406 (S.D. Fla. Jan. 15, 2009) (messengers on armored trucks and ATM technicians held to be driver-helpers). The driver-helpers classification appears to stem from an ICC (precursor to the DOT) report issued in 1941 concerning those employees it felt affected the safety operations of vehicles under its jurisdiction. The ICC "believe[d] that it is neither necessary nor practicable to draw fine distinctions between the work done by the various employees who ride on the motor vehicle in other capacities than that of driver. To some extent at least they all engage in activities which directly affect safety of operation." *Opelika*, 299 F.2d at 43 (quoting Ex parte MC-2, 28 M.C.C. 125 (1941)).

In the present case, based on the entirety of the evidence before the court, it appears, and the plaintiffs even state so in their briefing, that the chippers were required to ride in the rig while traveling from job to job. *See, e.g.*, Dkt. 53 at 5 ("It is undisputed that . . . Defendants *require [the*

14

chippers] to travel in the truck* after performing work in Pasadena and between chipping sites."(emphasis added)).  This conclusion is bolstered by the fact that  the chippers are paid, in part, based on the GPS system installed in the rigs—their pay begins when they enter the customer site and ends when they depart.  *See* Dkt. 53, Ex. 1 at 107.  Additionally, it is undisputed that the chippers traveled in interstate commerce.  Dkt. 52 at 4.  Even though the chippers may have rarely, if ever, actually engaged in safety-related activities, they are still exempt from the FLSA's overtime provisions by virtue of their jobs.[4]

Having found that C2C operated commercial motor vehicles during the period in question, and thus was subject to the Secretary of Transportation's jurisdiction, and that both drivers and chippers are employees that affect safety operations within interstate commerce, the defendants have carried their burden with respect to the MCA exemption and are not required pay overtime wages to the plaintiffs.

**B.**     **Minimum Wage Violations**

Plaintiffs allege that they were not compensated for pre-trip work they performed, travel time to and between job sites, and attendance at various meetings.  Dkt. 53.  As a result, C2C violated the FLSA's minimum wage requirements.  *Id.*  Defendants, however, contend that the plaintiffs have failed to meet their initial burden by not offering any evidence of the hours worked that were allegedly uncompensated, let alone that C2C paid the plaintiffs less than the minimum wage.  Dkt. 60 at 3.

---

[4]The parties disagree over whether the MCA exemption is determined on a 14-day or 4-month basis.  *See* Dkts. 61 at 2; 64 at 2.  The court need not reach this issue, however, because the evidence clearly shows that the chippers rode in the rigs as a regular part of their daily activities.  Thus, even the stricter 14-day basis for determining the MCA exemption is easily met under the driver-helpers analysis.

In order to bring a claim for violations of the FLSA's minimum wage requirements, a plaintiff bears "the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187 (1946). If the employer has kept accurate records, a plaintiff can easily meet this burden by securing the production of those records. *Id.* Where the employer, however, has failed to keep accurate records, the courts have imposed a burden shifting framework:

> the employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687–88; *see also Reeves v. Int'l Tel. and Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir. 1980).

C2C historically destroyed timesheets after processing payroll. *See* Dkt. 53, Ex. 3 at 172. Thus, to meet their burden, plaintiffs need only show "sufficient evidence" of the amount and extent of the work performed. Additionally, to show a violation of the minimum wage requirement, the plaintiffs must show that the total weekly hours divided by their pay is less than the required minimum wage. *See United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2nd Cir. 1960).

Plaintiffs, however, have wholly failed to meet this burden. They have produced no evidence whatsoever concerning how many hours plaintiffs worked, but were not compensated for. Neither have they shown that plaintiffs' total number of weekly hours worked divided by their weekly pay is less than the minimum wage. In contrast, defendants submitted evidence of the plaintiffs' hourly wage rates, all of which were above minimum wage. *See* Dkt. 60, Ex. 2. Even if the court were to

16

agree with plaintiffs' that they should have been compensated for some of the activities they performed, this would not be enough to show a minimum wage violation—the violation occurs only if the total hours worked divided by the pay is less than the minimum wage.  *See Hutson v. Rent-A-Center, Inc.*, 209 F. Supp. 2d 1353, 1359 (M.D. Ga. 2001) ("Plaintiff seems to assume that for each hour worked in excess of forty in a week, he is entitled to receive a minimum wage payment for the hours over forty per week, regardless of what he was paid for the other forty hours. This reasoning is flawed, as shown by Section 30b02 of the *Field Operations Handbook*  which provides: 'if the employee's total earning for the w/w [workweek] . . . divided by the compensable hours equals or exceeds the applicable MW [minimum wage], the employee has been paid in compliance with Sec 6.' Wage-Hour *Field Operations Handbook,* § 30b02, 12/9/88. Plaintiff has not produced any evidence showing that his total earnings are less than what he would have received if he had been paid the minimum wage for every hour worked.").

As plaintiffs have failed to meet their initial burden on the minimum wage violations and sufficient opportunity was afforded both sides to brief the matter, the court finds it appropriate to grant the defendants' summary judgment on this issue.[5]

## C.    Deductions for Workers' Compensation Insurance

Plaintiffs contend that defendants violated both the Texas Labor Code and the FLSA by withholding $28.00 per pay period from each of the plaintiffs' paychecks for workers' compensation insurance.  Dkt. 53 at 14.  The Texas Labor Code prohibits an employer from "collect[ing] from an employee, directly or indirectly, a premium or other fee paid by the employer to obtain workers'

---

[5]Although the defendants did not specifically file a motion for summary judgment on the minimum wage violation, they did ask in their response to plaintiffs' motion for summary judgment that the court deny these claims as a matter of law. *See* Dkt. 60 at 4.

compensation insurance coverage, except as provided in [sections of the Texas Labor Code that deal with subcontractors and contractors]." TEX. LAB. CODE §415.006(a).  Violations of this provision are considered an "administrative violation." §415.006(c).  Thus, the proper remedy for such a violation is to request an administrative hearing.  Only after such a hearing is the decision subject to judicial review.  § 415.035.  Because the plaintiffs are not appealing an administrative decision on this matter, this court lacks subject matter jurisdiction to hear this claim.

Additionally, plaintiffs's claims also fail under the FLSA for the same reason their minimum wage violations fail—the plaintiffs fail to show that this deduction reduced their pay to below the applicable minimum wage.  *See Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972).  Plaintiffs contend that 29 C.F.R. § 531.38 entitles the plaintiffs to recover as a matter of law for these deductions under the FLSA.  *See* Dkt. 53 at 14.  The regulation provides: "No deduction may be made for any tax or share of a tax which the law requires to be borne by the employer." 29 C.F.R. § 531.38.  A closer reading of the regulation as a whole, however, makes it clear that this particular section of the regulation is talking about which taxes can be considered "wages" under the FLSA.  This statement, therefore, taken in context, means that an employer cannot consider taxes borne by the employer as part of a employee's wages in making such calculations for purposes of the FLSA.  To show an actual violation of the FLSA, the plaintiff is still required to show that the employees' total weekly hours divided by his weekly pay is less than the minimum wage.

Therefore, plaintiffs' claims for the workers' compensation deduction under the Texas Labor Code are dismissed for lack of subject matter jurisdiction.  Additionally, plaintiffs having failed to

meet their initial burden to show a violation of the minimum wage requirement for this deduction under the FLSA, and defendants are granted summary judgment with regard to this claim.[6]

In sum, defendants have met their burden to show they fall within the MCA exemption from the FLSA's overtime pay requirements for the period between 2005–2008.  Additionally, defendants are granted summary judgment with respect to plaintiffs' claims for minimum wage violations and the workers' compensation deduction.  The court, therefore, need not reach the remaining FLSA issues posed by the parties: whether C2C committed a wilful violation of the FLSA, whether C2C acted in good faith in believing they complied with the FLSA, and whether defendant Taylor is considered an employer for purposes of the FLSA.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment on the MCA exemption is GRANTED.  Additionally, defendants are GRANTED summary judgment with respect to all other claims.  Plaintiffs' motions for summary judgment are, therefore, DENIED.  Lastly, plaintiffs' motions to strike are DENIED AS MOOT, except with respect to the rate sheet, which is DENIED.

Signed at Houston, Texas on March 31, 2010.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY

---

[6]Although the defendants did not specifically file a motion for summary judgment on this violation either, they did ask in their response to plaintiffs' motion for summary judgment that the court deny these claims as a matter of law. *See* Dkt. 60 at 7.

19